UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 95-1704

EDMUND H. BELANGER, ET AL.,

Plaintiffs, Appellants,

v.

WYMAN-GORDON COMPANY,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Aldrich, Senior Circuit Judge, 

and Cyr, Circuit Judge. 



Mark I. Zarrow, with whom Lian, Zarrow, Eynon & Shea was on 
brief, for appellants.
John O. Mirick, with whom Mirick, O'Connell, DeMallie & 
Lougee was on brief, for appellee. 



December 14, 1995


SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. 

decide what constitutes a benefit "plan" for purposes of the

Employee Retirement Income Security Act (ERISA), 29 U.S.C. 

1001-1467 (1988). The heart of the appellants' case is their

contention that a series of four early retirement offers extended

by their employer over a four-year period constitute an ERISA

plan. The district court thought not, and dismissed the suit

after a bench trial. We affirm.

I. I. 

Background Background 

We take the underlying facts principally from the

parties' pretrial stipulations.

Facing an uncertain economic future, defendant-appellee

Wyman-Gordon Co. (the company) decided to reduce its work force

in hopes of improving its overall financial outlook. The company

made its first move in November 1987. Rather than simply laying

off loyal minions, the company offered all age-qualified non-

union workers (characterized as all "weekly and monthly salaried

employees") an opportunity for early retirement (Offer No.1). To

make departing a sweeter sorrow, the company proposed to pay,

over and beyond regular retirement benefits, a lump-sum bonus

amounting to one week's pay for each year of service, plus two

days' pay for each year of service in excess of fifteen years,

multiplied by 110%. Offer No. 1 contained no cap on the number

of service years that could be included in calculating the amount

of the one-time bonus. Some eligible employees accepted the

2

offer and some did not.

In January 1990, the company, still in the throes of

downsizing, made a similar early retirement offer (Offer No. 2).

It structured this offer in much the same manner, but devised a

less complicated formula for computing retirement bonuses: one

week's salary for each year of service. Like Offer No. 1, Offer

No. 2 did not impose a ceiling on the number of service years

that could figure into the calculation. Once again, some but

not all of the eligible employees accepted the offer.

In corporate America, financial security is a

consummation ardently sought but seldom achieved. When the

company's prognosis remained gloomy, it sponsored yet another

early retirement offer (Offer No. 3) in January of 1991. This

offer contemplated that the amount of an individual's retirement

bonus would be calculated by the same formula used for purposes

of Offer No. 2 (multiplying one week's pay times the number of

service years), but capped the number of years includable in the

computation at twenty-five. Almost two-thirds of the weekly and

monthly salaried employees who were eligible to do so accepted

Offer No. 3, including the eighteen persons who appear here as

plaintiffs and appellants (all of whom had spent more than

twenty-five years in the company's service).

Despite the winnowing that occurred over time, the

company apparently convinced that strength lay in lack of

numbers undertook further cost-reduction measures in October of

1991. These included salary cuts and yet another early

3

retirement offer (Offer No. 4). As with the two immediately

preceding proposals, the carrot that the company dangled

consisted of a bonus calculated on the basis of one week's salary

for each year of service. This time, however, the company made

the offer accessible to more employees (by lowering the minimum

age for early retirement) and abjured any ceiling on the maximum

number of service years includable in figuring the lump sum.

Thirty-eight of forty-six eligible employees accepted Offer No.

4.

The appellants were displeased no little (and quite

some) upon learning of the more generous terms embodied in Offer

No. 4. Each of them had accepted a capped offer Offer No. 3 

as an inducement to take early retirement, and the cap

effectively reduced their early retirement bonuses by an average

of roughly $9,950 per retiree. They sued the company, alleging

inter alia that the series of four early retirement offers 

constituted a plan under the terms of ERISA, 29 U.S.C. 1002;

that the plan failed to comply with ERISA's imperatives, e.g, the

company had not provided a written plan description or a protocol

for amendment, see 29 U.S.C. 1022 & 1102; and that these 

violations entitled them to damages based on what they would have

received had Offer No. 3 not been capped, together with interest,

counsel fees, and other redress.

After conducting a non-jury trial, the district court

rejected the central premise underlying the appellants' claim.

The court held that the early retirement offer which the

4

appellants accepted did not constitute a plan for ERISA purposes,

and that, therefore, the company was not obliged to heed ERISA's

requirements. See Belanger v. Wyman-Gordon Co., 888 F. Supp. 9, 

12 (D. Mass. 1995). The appellants assign error.1

II. II. 

Discussion Discussion 

A. A. 

Standard of Review Standard of Review 

The question whether a given employee benefit or set of

benefits is a plan properly governed by the strictures of ERISA

requires a certain level of judicial versatility. Because an

inquiring court must both assess the facts and apply the law, two

different standards of review come into play. "For purposes of

appellate review, mixed questions of fact and law ordinarily fall

along a degree-of-deference continuum, ranging from plenary

review for law-dominated questions to clear-error review for

fact-dominated questions." Johnson v. Watts Regulator Co., 63 

F.3d 1129, 1132 (1st Cir. 1995). At the near end of the

continuum, the district court's interpretation of the word "plan"

as it is used in ERISA poses a question of law subject to de novo

review. At the far end of the continuum, the court's inquiry

into the nature and scope of the benefits actually at issue in

the instant case demands factfinding, and is to that extent

 

1In the district court, the appellants also raised other
claims. The court found against them on all fronts, see 
Belanger, 888 F. Supp. at 12-13, and only this ERISA claim has 
been preserved for review.

5

reviewable only for clear error. In other words, as long as the

trial court accurately applies the relevant legal standards, the

existence vel non of an ERISA plan is principally a question of 

fact, and the court of appeals must defer to the district court's

judgment unless that judgment is clearly erroneous. See Wickman 

v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir.), 

cert. denied, 498 U.S. 1013 (1990); see also Cumpiano v. Banco 

Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990) (explaining 

that there is no clear error "unless, on the whole of the record,

[the court of appeals] form[s] a strong, unyielding belief that a

mistake has been made").

B. B. 

The Meaning of "Plan" The Meaning of "Plan" 

The text of ERISA itself affords scant guidance as to

what constitutes a covered "plan." The statute, 29 U.S.C. 

1002(2)(A), merely constructs a tautology, defining an employee

benefit plan as "any plan, program or fund" established or

maintained by an employer that provides certain benefits to

employees. Relying on the purposes undergirding the statute to

give meaning to this cryptic language, the Supreme Court has made

it very clear that an employee benefit may be considered a plan

for purposes of ERISA only if it involves the undertaking of

continuing administrative and financial obligations by the

employer to the behoof of employees or their beneficiaries. See 

Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 12 (1987); see 

also District of Columbia v. Greater Wash. Bd. of Trade, 113 S. 

6

Ct. 580, 584 n.2 (1992) (construing Fort Halifax as holding that 

a plan exists only if an employer has "some minimal, ongoing

`administrative' scheme or practice").

Fort Halifax is the beacon by which we must steer. 

There, the Court rejected an ERISA preemption challenge to a

Maine statute requiring employers to tender a one-time severance

payment to displaced employees in the event of a plant closing.

The Court held that Maine's plant-closing law did not succumb to

ERISA's preemptive force because the legislatively mandated

tribute comprised no more than a "one-time, lump-sum payment

triggered by a single event." 482 U.S. at 12. Consequently, the

state statute neither "establishe[d], nor require[d] an employer

to maintain, an employee benefit plan." Id. (emphasis in 

original).

Two of ERISA's cardinal goals protection of employers

and protection of employees appear to have influenced the

Court's interpretation of what constitutes a plan. As to the

former goal, the Court acknowledged that Congress designed

ERISA's preemption provision partially to protect employers from

a "patchwork scheme" of regulations in respect to employee

benefits. Id. This concern has little or no pertinence, the 

Court reasoned, in a one-time payment situation in which the

employer's only obligation is to draw a single check. See id. 

By contrast, this concern is highly pertinent in respect to

employee benefits that place "periodic demands" on employer

assets, "creat[ing] a need for financial coordination and

7

control." Id. 

As to ERISA's other, more important goal, the Court

recognized that, in general, ERISA's substantive protections are

intended to safeguard the financial integrity of employee benefit

funds, to permit employee monitoring of earmarked assets, and to

ensure that employers' promises are kept. See id. at 15. Since 

a single-shot benefit requires no greater assurance than that the

check will not bounce, ERISA's panoply of protections has

virtually nothing to do with such a simple task. See id. at 16. 

More elaborately structured benefits, however, raise a different

set of concerns. As the Court observed, ongoing investments and

obligations are uniquely vulnerable to employer abuse or employer

carelessness, and thus require ERISA's special prophylaxis. See 

id. 

The upshot is that, in the albedo of Fort Halifax, the 

existence of a plan turns on the nature and extent of an

employer's benefit obligations. Withal, making particularized

judgments in this area on the basis of vague etchings of policy

is no mean feat. As we wrote on an earlier occasion, "so long as

Fort Halifax prescribes a definition based on the extent and 

complexity of administrative obligations, line drawing . . . is

necessary and close cases will approach the line from both

sides." Simas v. Quaker Fabric Corp., 6 F.3d 849, 854 (1st Cir. 

1993).

There is no authoritative checklist that can be

consulted to determine conclusively if an employer's obligations

8

rise to the level of an ERISA plan. While a wide array of

factors may be suggestive, typically "no single act in itself

necessarily constitutes the establishment of the plan, fund or

program." Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 

1982) (en banc). Yet, some factors tend to be more indicative of

the existence of a plan than others.

One very important consideration is whether, in light

of all the surrounding facts and circumstances, a reasonable

employee would perceive an ongoing commitment by the employer to

provide employee benefits. See Henglein v. Informal Plan for 

Plant Shutdown Benefits for Salaried Employees, 974 F.2d 391, 400 

(3d Cir. 1992); Donovan, 688 F.2d at 1373; cf. Johnson, 63 F.3d 

at 1135 (advocating that courts should judge the question of

whether an employer "established or maintained" a benefit plan

within the scope of ERISA "from the employees' place of

vantage"). Thus, evidence that an employer committed to provide

long-term or periodic benefits to its employees will often be

telling. See Henglein, 974 F.2d at 400; see also Kenney v. 

Roland Parson Contracting Corp., 28 F.3d 1254, 1258-59 (D.C. Cir. 

1994) (explaining that a plan may be created, even in the absence

of formal documentation, by "an employer's representation that a

plan has been established, in conjunction with any action, such

as withholding wages for contribution to such a plan, that tends

to confirm its representations"). Anticipating this reality,

this court stated in Wickman, 908 F.2d at 1083, that the "crucial 

factor in determining if a `plan' has been established is whether

9

the [proffering of an employee benefit] constituted an expressed

intention by the employer to provide benefits on a regular and

long term basis."

We end where we began. In this cloudy corner of the

law, each case must be appraised on its own facts. All that can

be stated with assurance is that Fort Halifax controls. Thus, so 

long as a proffered benefit does not involve employer obligations

materially beyond those reflected in Fort Halifax, see Simas, 6 

F.3d at 853-54, the benefit will not amount to a plan under the

ERISA statute.2

C. C. 

Analysis Analysis 

Viewed against this backdrop, the district court's

conclusion that ERISA did not apply to the series of early

retirement offers is eminently supportable. Nothing in the

offers, whether they are assessed individually or in the

aggregate, reflects the company's assumption of an ongoing

administrative or financial obligation to its employees within

the purview of Fort Halifax. 

Taken singly, the early retirement offers involve

 

2Simas involved a situation in which an employer had to 
fulfill, under state law, obligations analogous to, but
materially beyond, those imposed under the Maine statute at issue
in Fort Halifax. The Massachusetts statute addressed in Simas, 
unlike the Maine statute, required individualized employer
determinations, based on at least one nonmechanical criterion,
over a prolonged time period. See Simas, 6 F.3d at 853. Thus, 
we held that ERISA preempted the Massachusetts statute because
the statute imposed obligations on the employer equivalent to
those involved in an ERISA plan. See id. at 853-54. 

10

precisely the kind of one-time, lump-sum payment that the Fort 

Halifax Court clearly excluded from the pantheon of ERISA plans. 

See 482 U.S. at 12. The company's offers hinged on a purely 

mechanical determination of eligibility and, if accepted,

required no complicated administrative apparatus either to

calculate or to distribute the promised benefit. The offers

pivoted on a single, time-specific event. They did not involve

promises that had to be kept over a lengthy period, nor did the

company thereby make any lasting financial commitment of a type

that might implicate ERISA's substantive protections. The bottom

line is that the company did no more than propose to write a

single check to each eligible employee who accepted an early

retirement offer. If this is not Fort Halifax redux, it is 

sufficiently close to the Fort Halifax model that it falls 

outside ERISA's sphere. See Fort Halifax, 482 U.S. at 12; see 

also Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 258 

(8th Cir. 1994) (holding that a severance plan involving a one-

time payment is not an ERISA plan); Angst v. Mack Trucks, Inc., 

969 F.3d 1530, 1539 (3d Cir. 1992) (similar); Fontenot v. NL 

Indus., Inc., 953 F.2d 960, 962-63 (5th Cir. 1992) (similar). 

The more intriguing question in this case is whether

the incidence of serial offers the fact that the company made

not a lone offer but a succession of offers over a period of

roughly four years changes the result. We do not believe that

it does. Each of the four early retirement offers, in and of

itself, is beyond ERISA's reach. The appellants have not

11

advanced any convincing reason why the sheer number of ERISA-

exempt early retirement offers, without more, serves to alter the

Fort Halifax analysis. To be sure, in some circumstances a 

parade of early retirement offers might constitute a plan under

ERISA where, for example, employees rely on the promise of

future offers. Cf. Moeller v. Bertrang, 801 F. Supp. 291, 294-95 

(D.S.D. 1992) (emphasizing the importance of employee reliance on

employer promises of future benefits). But this record reveals

no such concatenation of circumstances. Here, the whole is no

greater than the sum of the parts.

Three pieces of information confirm this conclusion.

First, the administration of the offers neither required a

special mechanism nor engendered a need for nonmechanical

decisionmaking. Second, the record is devoid of any evidence

that the serial offers were the product of a prearranged design

or that the company ever represented to its work force that they

were linked in a defined sequence. Consequently, the employees

had no promises of financial obligation on which to rely, and,

thus, no need for ERISA's substantive protection. The finishing

touch is the district court's factual finding that the offers did

not impose continuing obligations of either an administrative or

a financial nature. See Belanger, 888 F. Supp. at 12. The 

appellants have pointed to no facts that remotely contradict this

factual finding.

To sum up, it appears that the company devised each

offer without giving thought to possible future offers, and that

12

each offer was motivated by a bona fide need to reduce costs.

Just as four eggs, without more, do not make an omelette, four

independent early retirement offers, without visible ties to each

other and without proof of an enduring obligation owed by the

employer to the employees, do not make an ERISA plan.3

III. III. 

Conclusion Conclusion 

We need go no further. The district court found, as a

matter of fact, that the company's four early retirement offers

involved no continuing administrative or financial obligation on

its part, and thus concluded, as a matter of law, that the offers

together did not constitute a plan under ERISA. On this record,

we emphatically agree.

Affirmed. Affirmed. 

 

3Although the appellants press heavily on the fact that the
same executive designed each retirement offer, this does nothing
to prove that he did so as part of an ERISA plan. Indeed, the 
uncontroverted evidence strongly suggests that successive offers
were necessary only because the corporate profit-and-loss
statement failed to recuperate in the projected time frame.

13